# UNITED STATES DISTRICT COURT

for the

Southern District of California

**FILED**

AUG 1 4 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| One LG LM-X410 Cellular Telephone (FG) IMEI 355380096043580 | ) |

Case No.

## 19MJ3427

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| 21 USC §§ 952, 960, 963 | Importation of a Controlled Substance, Conspiracy to Import a Controlled Substance |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Rainier Mendoza, SA, Dept. of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8/14/19

_____
*Judge's signature*

City and state:  San Diego, CA

Hon. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Rainier Mendoza, being duly sworn, hereby state as follows:

### INTRODUCTION

1.     This affidavit supports applications for warrants to search the following electronic devices, as further described in Attachments A-1 and A-2 (collectively the **Target Devices**), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952, 960 and 963, as more particularly described in Attachments B-1 and B-2:

> One Apple iPhone 8 Plus Cellular Telephone (A1864)
> IMEI 356114099893397 (as further described in Attachment A-1)
> **(Target Device 1)**

> One LG LM-X410 Cellular Telephone (FG)
> IMEI 355380096043580 (as further described in Attachment A-2)
> **(Target Device 2)**

2.     This search supports an investigation and prosecution of Bianca NUNEZ MARIN ("NUNEZ MARIN") and Oralia MARIN ("MARIN") for one or more of the crimes mentioned above.  A factual explanation supporting probable cause follows.

3.     The **Target Devices** were seized on May 29, 2019, from NUNEZ MARIN and MARIN after they were arrested at the Otay Mesa Port of Entry (the "OTMPOE") with approximately 19.84 kilograms of methamphetamine hidden within the doors, quarter panels, and back seat of a gray Honda Accord (the "Vehicle").  The **Target Devices** were transported to the Customs & Border Protection (CBP) vault located at 9777 Via De La Amistad, San Diego, CA 92154, where they are currently being securely stored.

4.     Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of one or more of the aforementioned crimes, as described in Attachments B-1 and B-2.

5.     The information contained in this affidavit is based upon my experience and training and consultation with other federal, state, and local law enforcement agents.  The evidence and information contained herein was developed from my personal investigation of this matter and my review of documents and evidence related to this case.  Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation.  Instead, it contains only those facts necessary to establish probable cause for the requested warrant.

## EXPERIENCE AND TRAINING

6.     I am a Special Agent employed with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI").  I have been so employed since December 2016.  Prior to my employment with HSI, I was employed as a Border Patrol Agent with the United States Border Patrol from July 2008 until December 2016.  In my current position with HSI, my duties include investigating the trafficking of federally controlled substances.  During my experience in law enforcement, I have had training in investigating the unlawful importation, possession, and distribution of controlled substances.  My experience includes many arrests, searches, and interviews.  I have also worked and consulted with many law enforcement officers experienced in narcotics smuggling investigations.  Through my experience and training, I have gained a working knowledge and insight into the operational habits of narcotics smugglers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at the San Diego International Ports of Entry.

7.     I am cross-designated by the United States Drug Enforcement Administration to conduct narcotics investigations and to enforce provisions of the Federal Controlled Substance Act, pursuant to Title 21 of the United States Code.  I have participated in criminal investigations involving, among other things, the illegal smuggling of narcotics into the United States, and I have received formal training in the

1    laws and regulations relating to such investigations including 21 USC §§ 952 and 960,
2    Importation of a Controlled Substance.  My training has also included how narcotics
3    smugglers use cellular and digital telephones and other electronic devices in the course
4    of their illicit activities.

5        8.    As an HSI Special Agent, my formal training consisted of six months of
6    residential instruction at the Federal Law Enforcement Training Center in Brunswick,
7    Georgia, which included training related to narcotics and dangerous drugs.  I have
8    participated in training programs related to controlled substances, including but not limited
9    to marijuana, cocaine, methamphetamine, and heroin.  I have also received training in the
10   methods used by narcotics traffickers to import, distribute, package and conceal controlled
11   substances.  Moreover, I have participated in numerous investigations and executed arrests
12   for drug-related offenses, including possession with the intent to distribute, transportation,
13   and the importation of controlled substances.

14       9.    Additionally, through the course of my duties as a Special Agent, I have
15   worked with other experienced narcotics investigators and received informal training
16   regarding illegal drug trends and methods of operation for multi-kilogram drug dealing and
17   trafficking in the San Diego area.

18       10.   Based on my training and experience, I am familiar with the ways in which
19   drug smugglers and traffickers conduct their business.  Indeed, during the course of my
20   duties I have (1) worked as a case agent, directing specific drug-related investigations; (2)
21   worked as a surveillance agent who observed and recorded movements of individuals
22   suspected of trafficking drugs; (3) participated in the execution of search warrants related
23   to drug investigations; (4) initiated and executed numerous arrests for drug-related
24   offenses, including possession with the intent to distribute; and (5) interviewed criminal
25   defendants, witnesses, and informants in furtherance of investigations into the illegal
26   smuggling and trafficking of controlled substances.  Through these duties, I have gained a
27   working knowledge and insight into the operational habits of drug smugglers and
28   traffickers.

11.     Based upon my training and experience and consultations with law enforcement officers experienced in drug smuggling and trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.     Drug smugglers and traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages;

b.     Drug smugglers and traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c.     Drug smugglers and traffickers and their coconspirators will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d.     Drug smugglers and traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e.     Drug smugglers and traffickers will use cellular/mobile telephones to notify or warn their coconspirators of law enforcement activity to include the presence and posture of marked and unmarked units as well as the operational status of checkpoints and border crossings; and

f.     Drug smugglers and traffickers and their coconspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

12.     Based upon my training and experience and consultations with law enforcement officers experienced in drug smuggling and trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as text messages, photographs, audio files, videos, and

location data.  This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone.  Specifically, I know based upon my training, education, and experience investigating drug smuggling and trafficking conspiracies that searches of cellular/mobile telephones sometimes yields evidence:

> a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States, or possess and/or transport with the intent to distribute methamphetamine or federally controlled substances within the United States;
>
> b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute methamphetamine or federally controlled substances within the United States;
>
> c. tending to identify coconspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute methamphetamine or federally controlled substances within the United States;
>
> d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute

1  methamphetamine or federally controlled substances within the
2  United States, such as stash houses, load houses, or delivery points;

3      e.    tending to identify the user of, or persons with control over or access
4  to, the subject telephone; and/or

5      f.    tending to place in context, identify the creator or recipient of, or
6  establish the time of creation or receipt of communications, records,
7  or data involved in the activities described above.

8      13.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity
9  modules, are smart cards that store data for GSM cellular telephone subscribers. Such data
10  includes user identity, location and phone number, network authorization data, personal
11  security keys, contact lists and stored text messages. Some of the evidence generated by a
12  smuggler's use of a cellular telephone would likely be stored on any SIM Card that has
13  been utilized in connection with that telephone.

14      14.    Based on my training and experience, which includes discussions with other
15  law enforcement officers who investigate drug smuggling and trafficking, I know that drug
16  conspiracies often require detailed and intricate planning to successfully evade detection.
17  Consequently, drug conspiracies often involve planning and coordination for several
18  months—this planning often occurs through mobile telephones. Additionally, based on
19  my training and experience, and conversations with other law enforcement officers who
20  investigate drug smuggling and trafficking, I know that coconspirators are often unaware
21  when a fellow coconspirator has been arrested and will attempt to communicate with that
22  coconspirator via mobile telephone after his or her arrest to determine the whereabouts of
23  drugs that are being transported.

24  **FACTS SUPPORTING PROBABLE CAUSE**

25      15.    According to a report prepared by Customs and Border Protection Officer
26  (CBPO) John Rodriguez, on May 29, 2019, at approximately 1752 hours, CBPO Rodriguez
27  was assigned to lane #7 at the Otay Mesa Port of Entry, performing primary inspection
28  duties on vehicles applying for entry into the United States from Mexico. A grey Honda

1   Accord bearing California license plate # 4TRG010 approached his booth.  The driver,
2   later identified as Bianca Nunez Marin presented her United States Passport for
3   identification.  The only passenger in the vehicle was later identified as Oralia Marin.

4           16.     According to CBPO Rodriguez's report, NUNEZ MARIN stated that she did
5   not have anything to declare before entering the United States.  CBPO Rodriguez then
6   asked her to open the trunk of the vehicle, and NUNEZ MARIN complied.  CBPO
7   Rodriguez then inspected the trunk and saw personal items in plain view.  CBPO Rodriguez
8   then moved to the driver's side quarter panel of the vehicle, which he was able to open.
9   Once he opened the panel, he saw packages wrapped in cellophane.  CBPO Rodriguez was
10  able to touch one of the packages and squeeze it.  He noted that the package had a crunchy
11  feel to it.  He then referred the vehicle to secondary inspection.

12          17. According to a report prepared by CBPO Leyva, the vehicle was then put through
13  the Z-portal system, which essentially takes an x-ray type image of the vehicle.  CBPO
14  Leyva, who was operating the Z-portal system, observed in the image anomalies concealed
15  within the rear quarter panels, doors, and spare tire areas.

16          18.  According to a report by CBP Canine Enforcement Officer (CEO) Ted Stone, a
17  Narcotics and Human Detection Dog (NHDD) performed a canine sniff of the Vehicle.
18  The NHDD alerted to the underside of the vehicle near the rear quarter panel on the
19  passenger side.

20          19.     According to his report, CBPO C. Mansouri was assigned to perform a
21  secondary inspection on the Vehicle.  CBPO Mansouri observed packages concealed
22  within the rear quarter panels, doors, and back seat.  The packages contained a white
23  substances, which later tested positive for the characteristics of methamphetamine.  There
24  were 40 packages removed from the Vehicle.  All of the packages felt similar.  The weight
25  of all of the packages was approximately 19.84 kilograms.

26          20.     On May 29, 2019, at approximately 2144 hours, I responded to the OTMPOE,
27  where NUNEZ MARIN, MARIN, the Vehicle, methamphetamine, and the **Target Devices**
28  were being held for further processing.  **Target Device 1** was seized from NUNEZ MARIN

by CBPO Mansouri; **Target Device 2** was seized from MARIN by CBPO Mansouri. NUNEZ MARIN verbally acknowledged to me that **Target Device 1** belonged to her. MARIN verbally acknowledged to me that **Target Device 2** was hers.

21.   On May 29, 2019, at approximately 9:44p.m., I interviewed NUNEZ MARIN. During the interview, NUNEZ MARIN stated that the vehicle is registered to MARIN, who is her mother.  NUNEZ MARIN stated that while the vehicle is registered to her mother, NUNEZ MARIN is the primary driver of the vehicle.  NUNEZ MARIN stated that she purchased the vehicle for $1400 through a service called "OfferUp."  At first, NUNEZ MARIN stated that she paid cash; later NUNEZ MARIN stated that her mother utilized a loan through "Title Max" to purchase the vehicle and that her mother is still paying the loan.

22.  During the interview, NUNEZ MARIN stated that she was in Mexico at 10:30 a.m. earlier in the day to visit her grandmother, "Cecilia Nunez."  NUNEZ MARIN stated that her grandmother lives with NUNEZ MARIN's aunt, "Viene Nunez," in an area called "Otay."  NUNEZ MARIN described the residence as being a two-story condominium building and that her grandmother lives in the bottom unit, which has two bedrooms.

23.   During the interview, NUNEZ MARIN stated that after arriving at her grandmother's residence, "[w]e were just at her house just chillin' there."  NUNEZ MARIN stated that the only people at the house were her grandmother, her mother, and herself. NUNEZ MARIN stated that she and her mother went to "Revolucion" to get tea at 1:00 p.m. and NUNEZ MARIN drove the vehicle during the trip.  They returned to the grandmother's residence at 3:30 p.m. and then left the residence between 4:30 p.m. and 5:00 p.m. and traveled to the border.

24.  During the interview, NUNEZ MARIN stated that no one else had possession of the vehicle while she was at her grandmother's residence.  She further stated that no one else had possession of the key to the vehicle, that there is only one key, that there was no spare, and that there is no car alarm. NUNEZ MARIN stated she did not know how drugs could get into the vehicle.

25.   NUNEZ MARIN stated that she did not contact anyone who resides in Mexico during the trip.   She stated that she knew her mother, MARIN, was contacting other individuals, but NUNEZ MARIN did not know who those individuals were.   When asked if MARIN would know how the drugs got into the vehicle, NUNEZ MARIN shrugged her shoulders and said, "I don't know."

26.   On May 29, 2019, at approximately 2218 hrs, I interviewed MARIN.   MARIN stated that she left La Mesa, California at approximately 9:30 a.m. to visit her grandmother's house in Mexico.   MARIN stated that she was the driver of the vehicle and that her daughter, NUNEZ MARIN, was a passenger.   MARIN stated that her grandmother lives in an area in Mexico called, "Otay."   MARIN described the residence as a blue house in a gated community.   She further stated that the house was a two-story home with 2-3 bedrooms and that there is a bedroom on the second story with the kitchen located on the bottom floor.   She also stated that her uncle, "Jose Martinez," and her aunt, "Laura Martinez," live at the residence.   MARIN stated that her grandmother's name is "Josepha Martinez."

27.   During the interview, MARIN stated that she left her grandmother's residence to purchase an energy drink at a 7-11 store.   MARIN stated that she and NUNEZ MARIN walked to the store and was unsure of the time of the trip to 7-11.   She stated that she purchased cigarettes and an energy drink and returned to her grandmother's residence.   MARIN stated that other than the trip to the 7-11 store, which was about a 3-5 minute walk, she just kept her grandmother company during the visit and did nothing else.

28.   During the interview, MARIN initially stated that the Vehicle was parked near her grandmother's residence in a driveway.   Later in the interview, MARIN stated that the Vehicle was parked on the side of the street and was not visible from the residence.   MARIN stated that no other person had possession of the Vehicle and that she left the key to the Vehicle on a table at her grandmother's residence.

29.   During the interview, MARIN stated that at some time between 5:00 p.m. and 6:00 p.m., she decided to return to the United States.   She said she did not stop anywhere

else on the return to the United States and that the trip to the border took about 10-15 minutes.

30.   MARIN explained during the interview that she had contacted "Delilah" and "Priscilla" while in Mexico to see if they wanted to meet, but they were unable to. MARIN stated that she had met the two individuals during previous visits to Tijuana. MARIN explained that the two individuals lived in Tijuana. MARIN stated that she is "friends" with Delilah on Facebook and communicates with her through "WhatsApp." MARIN stated that she communicates with Priscilla through Facebook Messenger.

31.   MARIN stated that she did not know how drugs got into the Vehicle.

32.   Based upon my experience and investigation in this case, there is probable cause to believe that NUNEZ MARIN and MARIN, as well as other persons currently unknown, were involved in an ongoing conspiracy to import and transport methamphetamine and other federally controlled substances. Based on my experience investigating drug smugglers and traffickers, there is probable cause to believe that NUNEZ MARIN and MARIN used the **Target Devices** to coordinate with coconspirators regarding the importation, transportation, and distribution of methamphetamine and other federally controlled substances, and to otherwise further this conspiracy both inside and outside of the United States. There is also probable cause to believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Devices**, which may identify other persons involved in drug trafficking activities.

33.   Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of NUNEZ MARIN and MARIN, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are

1  stored in the memory of the **Target Devices**.  Therefore, for the reasons set forth above, I

2  request permission to search the **Target Devices** for items listed in Attachment B-1 and B-

3  2 for the time period from February 28, 2019 up to and including May 30, 2019.

4  <center>**METHODOLOGY**</center>

5  34.  It is not possible to determine, merely by knowing the cellular/mobile

6  telephone's make, model and serial number, the nature and types of services to which the

7  device is subscribed and the nature of the data stored on the device.  Cellular/mobile

8  devices today can be simple cellular telephones and text message devices, can include

9  cameras, can serve as personal digital assistants and have functions such as calendars and

10 full address books and can be mini-computers allowing for electronic mail services, web

11 services and rudimentary word processing.  An increasing number of cellular/mobile

12 service providers now allow for their subscribers to access their device over the internet

13 and remotely destroy all of the data contained on the device.  For that reason, the device

14 may only be powered in a secure environment or, if possible, started in "flight mode" which

15 disables access to the network.  Unlike typical computers, many cellular/mobile telephones

16 do not have hard drives or hard drive equivalents and store information in volatile memory

17 within the device or in memory cards inserted into the device.  Current technology provides

18 some solutions for acquiring some of the data stored in some cellular/mobile telephone

19 models using forensic hardware and software.  Even if some of the stored information on

20 the device may be acquired forensically, not all of the data subject to seizure may be so

21 acquired.  For devices that are not subject to forensic data acquisition or that have

22 potentially relevant data stored that is not subject to such acquisition, the examiner must

23 inspect the device manually and record the process and the results using digital

24 photography.  This process is time and labor intensive and may take weeks or longer.

25 35.  Following the issuance of this warrant, I will collect the **Target Devices** and

26 subject it to analysis.  All forensic analysis of the data contained within the telephone and

27 its memory cards will employ search protocols directed exclusively to the identification

28 and extraction of data within the scope of this warrant.

<center>11</center>

36.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## CONCLUSION

37.     Based on all of the facts and circumstances described above, there is probable cause to conclude that Bianca NUNEZ MARIN and Oralia MARIN used the **Target Devices** to facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

38.     Because the **Target Devices** were promptly seized during the investigation of Bianca NUNEZ MARIN and Oralia MARIN's trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by Bianca NUNEZ MARIN and Oralia MARIN continues to exist on the **Target Devices**. Based on the above facts and my training and experience, there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 will be found within the date range from February 28, 2019 to and including May 30, 2019.

//
//
//
//
//
//
//
//
//
//
//
//

39.     WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A1 and A2 and to seize the items listed in Attachments B1 and B2, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Rainier Mendoza
HSI Special Agent

Subscribed and sworn to before me this ___14th___ day of August, 2019.

The Honorable Allison H. Goddard
United States Magistrate Judge

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

> One LG LM-X410 Cellular Telephone (FG)
> IMEI 355380096043580
> **(Target Device 2)**

**Target Device 2** is currently in the possession of the U.S. Customs & Border Protection (CBP) (evidence vault) located at 9777 Via De La Amistad, San Diego, CA 92154.

## ATTACHMENT B-2

ITEMS TO BE SEIZED

Authorization to search **Target Device 2** as described in Attachment A2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device 2** for evidence described below. The seizure and search of **Target Device 2** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from **Target Device 2** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from third-party applications, photographs, audio files, videos, and location data, for the period of February 28, 2019 up to and including May 30, 2019:

a.   tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

c.   tending to identify coconspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

d.   tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

e.   tending to identify the user of, or persons with control over or access to, **Target Device 2**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.